UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

FAMILY WORSHIP CENTER
PENTECOSTAL CHURCH OF HOLINESS, INC.,
RICHARD EICHELBERGER,
JIMMY LEE TURNAGE,

              Plaintiffs,

UNITED HEALTHCARE OF WISCONSIN INC.,
MILWAUKEE COUNTY DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

              Involuntary Plaintiffs,

           v.                          Case No. 09-C-0094

JEANINE SEE,
SHAWN HUMITZ,
CITY OF MILWAUKEE,

              Defendants.

MEMORANDUM REGARDING THE COURT'S DECISION
TO GRANT IN PART AND DENY IN PART DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT

On December 10, 2006, Officer Jeanine See pursued James Jones into the Family

Worship Center Pentecostal Church of Holiness, Inc. (Family Worship), down the aisle and

arrested Jones in the pulpit area. Family Worship, and church members, Richard

Eichelberger and Jimmy Lee Turnage, filed a complaint in Milwaukee County Circuit Court

alleging multiple violations of the First, Fourth, and Fourteenth Amendments, as well as

state law claims of assault and battery, trespass, false arrest, and false imprisonment.

Defendants filed a notice of removal and have since moved for partial summary judgment.

At the same time, defendants concede that there must be a trial on the Fourth Amendment

excessive use of force claims against Officer Humitz by Eichelberger and Turnage, along with the associated state law claims of assault and battery.

Plaintiffs, who did not move for summary judgment by the court's October 31, 2011, deadline, assert that they are entitled to summary judgment on the Fourth Amendment claims.[1] However, plaintiffs admit that Family Worship cannot pursue a false imprisonment or false arrest claim and that plaintiffs Turnage and Eichelberger cannot pursue trespass claims. Accordingly, these claims will be dismissed.

In addition, the court finds that the City of Milwaukee is entitled to dismissal as a named defendant. A municipality cannot be held liable under § 1983 on a respondeat superior theory; that is, solely because it employs a tortfeasor. *Monell v. Department of Social Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed.2d 611 (1978). In opposition to the partial summary judgment motion, plaintiffs do not argue that they are asserting a direct action against the City. Rather, plaintiffs cite to § 895.46(1)(a), Wis. Stats., which permits a prejudgment, direct action against the City when the City is a potential indemnitor and the police officers are parties to the suit. *See Estate of Watts v. Heine*, 2008 WL 4058032 at \*1 (E.D. Wis. 2008)(unpublished decision). Even under this statute and the case law interpreting the statute, the City is not a necessary party. Plaintiffs have argued that the City should remain in this action solely as the indemnifying employer of the individual defendants because the City concedes that it officers were acting under color of

---

[1] The court will not entertain plaintiffs' request for entry of judgment on the Fourth Amendment and assault and battery claims inasmuch as they were not raised in the context of a properly filed summary judgment motion. Defendants' motion correctly observed that there are genuine issues of material fact with respect to these claims.

law and within the scope of their employment.  The court will stay entry of dismissal until the final judgment is entered.

With respect to the remaining claims, summary judgment obviates the need for trial only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record to determine whether there is a genuine need for trial.  See Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e).  As the parties are aware, the court must construe all facts in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Material facts are those which might impact the outcome of the lawsuit.  *Insolia v. Philips Morris, Inc.*, 216 F.3d 596, 598–99 (7th Cir. 2000).

After thoroughly reviewing the submissions of the parties, relatively few material facts are uncontested.  For purposes of trial, the parties have established that Family Worship is a Wisconsin not-for-profit corporation, with its principal facility located at 1428 North 27th Street in Milwaukee, Wisconsin.  (Compl. ¶ 3.)  Eichelberger and Turnage are adult residents of Milwaukee and members of Family Worship.  (Compl. ¶¶ 4, 6.)

The City is a municipal corporation under the laws of the State of Wisconsin, and the employer of Officers See and Humitz.  (Compl. ¶¶ 8-10.)  The parties agree that at all times relevant to this litigation See and Humitz were acting under the color of law and within the scope of their employment.  (Compl. ¶¶ 8, 9; See Aff. ¶¶ 1-2; Humitz Aff. ¶¶ 1-2.)

3

During the evening of December 10, 2006, See was assigned to general patrol duties and was assigned to act as a field training officer for Joel Susler, a recent graduate of the police training academy. (See. Aff. ¶¶ 2-4.) Because Susler was a recruit on probationary status at the time, See was the officer in control or responsible for the situation. (Thomsen Aff. ¶ 16 Ex. 15, Alba Dep. at 59.)

At approximately 7:00 p.m. on December 10, 2006, Susler and See were engaged in performing general patrol duties in the area of North 27th Street in the City of Milwaukee. (See Aff. ¶ 5.) As they traveled through the area near the intersection of 27th and Vliet Streets, See observed a tall, big man who was later identified as James Jones, throw a large, hard-plastic bread crate at their squad car. (See Aff. ¶ 6.) A few moments later, See observed Jones walking across the intersection of 12th and Vliet Streets in the traffic lanes, causing cars to swerve and stop to avoid hitting him. (See Aff. ¶ 7.) According to See, Jones was pounding his hand on the window of at least one of the vehicles. (See Aff. ¶ 8.) Either immediately before or after the crate hit the squad car, See made a call for assistance requiring lights and sirens because Jones was big, she had a new recruit, and she didn't want to take a chance on backup being delayed if help were needed in the busy District 3. (Thomsen Aff. ¶ 10, Ex. 9, Susler Dep. 12-14; Thomsen Aff. ¶ 8, Ex. 7, See Dep. Vol II 11, 28, 41-42; Thomsen Aff. ¶ 9, Ex. 8, Kresa Dep Ex. 1.)

Jones was wearing a knee-length puffy down-filled jacket, his appearance was unkept and he was shouting indistinguishable words. (See Aff. ¶ 9.) Jones' puffy jacket covered his body. (See Aff. ¶ 12.) See was concerned about the erratic nature of Jones' actions, and suspected he might be in need of mental health care. (See Aff. ¶ 10.)

4

As See emerged from her squad car, See unholstered her firearm and placed it in a low-ready position telling Jones to get on the ground. (See Aff. ¶ 13.) Jones said something to the effect of "Shoot me, I want the police to shoot me, I am God." (See Aff. ¶ 14.) These words reinforced See's conclusion that Jones was mentally unstable and that Jones was attempting to force officers to shoot him, thereby committing "suicide by cop." (See Aff. ¶ 15.) See again radioed the police dispatcher. (See Aff. ¶ 16.)

See reholstered her firearm and took out her can of oleoresin capiscum (OC) spray. (See Aff. ¶ 17.) Because of the erratic actions exhibited by Jones and his statement about wanting an officer to shoot him, See was concerned for the safety of Susler, Jones and herself. (See Aff. ¶ 19.) She decided to spray Jones, with the intent of causing him to be momentarily incapacitated so that See could more safely take control of his hands by handcuffing him and transport him to the Milwaukee County Mental Health Complex for mental health observation and/or treatment. (See Aff. ¶¶ 20, 21.) However, Jones turned and ran into the Family Worship church. (See Aff. ¶ 22.)

At some point See let dispatch know that she was entering the church. (Thomsen Aff. ¶ 8, Ex. 7, See Dep. Vol II at 25.) Susler and See entered the building through the main doors, which faced 27th Street, and which were located on the west side of the church. (See Aff. ¶ 29.) As See entered the church, she observed Jones in a kneeling position in the pulpit area, which was located on the east side of the church. (See Aff. 28.) See quickly approached Jones and See believed that Susler followed her down the aisle. (See Aff. ¶ 30.) The photographs of the church attached to See's affidavit depict the aisle down which See traveled and the pulpit area on the east side of the church (the pulpit area is on the right and the choir area is on the left). (See Aff. ¶ 31.)

5

See made physical contact with Jones in the pulpit area, and attempted to take him into custody. (See Aff. ¶ 32.) See and Susler took Jones into custody and placed handcuffs on his wrists, which were located behind his back. (See Aff. ¶ 33.) While See was struggling with Jones, Turnage walked over to the half rail at least once to look while Jones was kneeling. (See Aff. ¶ 39; Thomsen Aff. ¶ 5, Ex. 4, Turnage Dep at 140-151; Thomsen Aff. ¶ 6, Ex. 5, Humitz Dep. At 138-139.)

Meanwhile, at approximately 7:30 p.m., Humitz overheard a radio communication by See indicating that she was involved in a potential "suicide by cop" situation. (Humitz Aff. ¶¶ 2-3.) He determined that he would provide assistance and arrived shortly thereafter at the Family Worship church. (Humitz Aff. ¶ 4.) Humitz observed an individual who appeared to be a church member standing on the sidewalk outside of the church entrance, which was located on the west side of the building facing 27th Street. (Humitz Aff. ¶ 6.) The nonverbal communication Humitz observed from that individual indicated to Humitz that the subject of his dispatch was located inside the church. (Humitz Aff. ¶ 7.) Humitz proceeded through the front doors and into the church, and observed other officers located on the far east side of the church. (Humitz Aff. ¶ 8.)

What happened next is in dispute, but the parties agree that at some point Officer Kresa entered the church followed by Humitz and that they ran or walked quickly down the same aisle that See and Susler had used. (See Aff. ¶ 44; Thomsen Aff. ¶ 6, Ex. 5, Humitz Dep. at 86-87; Thomsen Aff. ¶ 5, Ex. 4, Eichelberger Dep. at 65-66.) See observed Kresa put a foot up on the wooden half-wall railing which surrounding the pulpit area, and use his weight to bring Jones to the ground. (See Aff. ¶ 47.) See continued to observe people in

6

the church, who were vocalizing that they were unhappy with the officers' presence in the church. (See Aff. ¶ 49.)

Moreover, there was a point at which Humitz radioed to send a supervisor and a Taser operator. (Humitz Aff. ¶ 18.) See told Humitz that Turnage should be arrested because he was disorderly earlier when he kept coming up to the pulpit area while See was taking Jones into custody and See told him several times to get back. (See Aff. ¶ 57.) See was still located within the pulpit area and at some point was approximately 4-6 feet away from Humitz. (See Aff. ¶ 59.) Turnage was positioned facing the floor and appeared to be on his knees. (See Aff. ¶ 60.) See observed Humitz holding his baton and make a striking motion with his baton directed towards Turnage. (See Aff. ¶ 63.) She also observed Humitz raise his arm in what appeared to be the process of making a second baton strike, but then See moved closer to Humitz and Turnage and saw Turnage's arm move toward his back as if he were giving up his struggle. (See Aff. ¶ 66.) Eventually, Humitz was able to handcuff Turnage with the assistance of others. (See Aff. ¶ 68.) There is no dispute that Humitz remained in the church sanctuary. (Humitz Aff. ¶ 27.)

Having reviewed the facts and evidence in the record, the court will grant summary judgment on the equal protection claim. Plaintiffs have alleged that they had expectations and rights to receive and enjoy treatment and protection under the law equal and similar to that enjoyed by non-African American churches, congregations, and individuals, all as guaranteed by the Fourteenth Amendment to the United States Constitution, as well as by Article 1, §§ 1 and 22 of the Wisconsin Constitution. (Compl. ¶ 49.) In addition, plaintiffs allege that defendants singled out the plaintiffs "as a class of one based on socio-economic or other impermissible characteristics." (Compl. ¶ 50.)

7

The equal protection clause "commands that no state shall deny to any person within its jurisdiction the equal protection of the laws ... which essentially is a direction that all persons similarly situated should be treated alike." *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006) (internal citations and quotations omitted). To establish a violation of the Fourteenth Amendment's equal protection clause, a plaintiff must establish that a state actor has treated him differently than persons of a different race and the actor did so purposefully. *Xiong v. Wagner*, 700 F.3d 282, 285 (7th Cir. 2012) (citing *Billings v. Madison*, 259 F.3d 807, 812 (7th Cir. 2001). Plaintiffs have made no attempt to identify a similarly situated congregation treated more favorably than Family Worship, and the only direct evidence cited is the deposition testimony of Turnage in which he says that he was offended when See called them "idiots." Turnage did not hear Humitz use any racially derogatory terminology. Nothing else supports an equal protection violation beyond the base assertion that it is "not unreasonable to infer that the actions of the defendants in the Family Worship Center–consisting entirely of African American members–were based on the racial make-up of the membership of the church given that it is undisputed that Officers See, Susler, Kresa and Humitz are Caucasian." (Doc. 48 at 27.) This court declines the invitation to infer purposeful discrimination based on the officers' race.

Plaintiffs cite Eichelberger's testimony that at some time after December 10, 2006, Eichelberger asked Sergeant Banks–an African American–whether the police would have reacted similarly with an all-white congregation. In a classic hearsay statement, Eichelberger said that Banks said "Probably not." Plaintiffs have cited to one page of a deposition transcript without providing any context for this statement. That someone believes that the officers "probably" would have treated a white congregation differently

8

does not constitute direct proof of purposeful discrimination by the officers present on the evening of December 10, 2006.

Beyond that, the affidavits and deposition testimony in the record regarding the actual events and the sequence of those events preclude summary judgment on the First, Fourth and Fourteenth Amendment and state law claims. Under the First Amendment, plaintiffs have alleged that defendants violated their "rights to freely exercise their religion, and to speak freely and assemble." To constitute a violation of the Free Exercise Clause, the government must place a "substantial burden on the observation of a central religious belief or practice." *Wisconsin v. Yoder*, 406 U.S. 205, 220-21, 92 S. Ct. 1526, 32 L. Ed.2d 15 (1972). Here, plaintiffs have produced evidence that See and Humitz stayed for some time after Jones's arrest ignoring church members' requests to leave so that they could continue their worship. In addition, See ordered the music to stop and ordered a child–speaking in tongues–to "shut up."

Next, the Fourth Amendment, incorporated against the States by the Fourteenth Amendment, *Contreras v. City of Chicago*, 119 F.3d 1286, 1290 (7th Cir.1997), provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." U.S. Const. amend. IV. A person has been "seized" within the meaning of the Fourth Amendment if, in view of all of the circumstances surrounding the incident, a reasonable person would not have believed that he was free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980); *White v. City of Markham*, 310 F.3d 989, 993 (7th Cir. 2002).

9

Whether See and Humitz stayed longer than necessary or felt threatened by the church members is an issue of fact.[2] There is evidence that See disregarded Sergeant Ordonez's order to remove the prisoners, left the prisoners sitting handcuffed on the floor, ordered the pastor into another area for questioning, ordered members to remain seated, prevented parents from reaching their children, screamed at church members, ordered a child speaking in tongues to shut up, and threatened more arrests. Moreover, Officer Kresa testified that he never felt threatened and that he did not see church members appear threatening. Other evidence suggests that See made multiple emergency requests and took no steps to call off officers who proceeded to the basement with their weapons drawn.

On the issue of whether See had a duty to intervene, the Seventh Circuit case has instructed:

> An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer has reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Chavez v. Ill. State Police*, 251 F.3d 612, 652 (7th Cir. 2001) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir.1994)) (emphasis in original). "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could

---

[2]Defendants argue that plaintiffs cannot raise claims not alleged in the complaint. At paragraphs 20, 21, 26, 27 and 28 of the complaint which was removed from state court, plaintiffs allege that See disregarded members' requests to take Jones outside, failed to control the other officers who occupied the church, prevented members from reaching their children in the basement, refused to leave the church premises and refused to allow church members to leave, and conducted an unlawful search. (Doc. 1.)

10

not possibly conclude otherwise." *Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir.1997) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2nd Cir.1994)).

A jury will decide whether Jones resisted, Turnage asked for badge numbers or interfered with the arrest, Turnage was beaten by officer(s), or See observed strikes, blows, or kicks with respect to Turnage or Eichelberger. Indeed, See was the officer that called for backup and was in close proximity of Humitz and Turnage at the time of the alleged assaults. The photographs attached to See's affidavit and the deposition of Turnage underscore that this was not a large space. That said, plaintiffs conceded during the telephonic hearing on March 28, 2012, that they are not asserting a duty to intervene claim with respect to Humitz.

Because of the many disputes involving genuine issues of material fact, the court cannot decide qualified immunity on defendants' motion. "Qualified immunity shields a government official from liability for civil damages unless his or her conduct violates a clearly established principle or constitutional right of which a reasonable person would have known at the time." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012). The test for qualified immunity is "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Betker*, 692 F.3d at 860 (quoting *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir.2012). "Although the privilege of qualified immunity is a defense, the plaintiff bears the burden of defeating it." *Betker*, 692 F.3d at 860. Taking the disputed facts in the light most favorable to plaintiffs – the nonmoving party – there is an argument that the defendant officers violated plaintiffs' clearly established First, Fourth and Fourteenth Amendment rights.

11

On the state law claim of trespass, the court has outlined above the factual disputes that preclude summary judgment with respect to Family Worship. Plaintiffs raised a genuine issue of material fact regarding whether defendants remained longer than necessary on the premises. Defendants have raised Wis. Stat. § 893.80(4):

> (4) No suit may be brought against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

However, the immunity conferred by Wis. Stat. § 893.80(4) is subject to "several exceptions 'representing a judicial balance struck between the need of public officers to perform their functions freely [and] the right of an aggrieved party to seek redress.'" *Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶ 24, 253 Wis.2d 323, 646 N.W.2d 314 (quoting *C.L. v. Olson*, 143 Wis.2d 701, 710, 422 N.W.2d 614 (1988)) (internal quotation marks omitted). The Wisconsin Supreme Court has recognized limitations to governmental immunity where the activities performed are: (1) ministerial duties imposed by law; (2) duties to address a known and compelling danger; (3) actions involving professional discretion; and (4) malicious, willful, and intentional acts. *Scott v. Savers Prop. & Cas. Ins. Co.*, 2003 WI 60, ¶ 16, 262 Wis.2d 127, 663 N.W.2d 715. There are genuine issues of material facts regarding the "malicious, willful, and intentional acts," specifically the length of time that See and Humitz remained in the church and whether they intentionally disregarded orders to leave.

The state law assault and battery claims against See survive defendants' motion notwithstanding the lack of evidence that See made physical contact with Turnage or

12

Eichelberger. Taken in the light most favorable to the plaintiffs, the evidence placed See in charge and ordering prisoners and congregation members not to move, blocking the hallway and punching a church member, yelling at and threatening members, and, most importantly, standing in near proximity to Humitz but failing to intervene as Humitz allegedly assaulted Turnage and Eichelberger. However, plaintiffs have failed to persuade this court that Family Worship has standing to pursue assault and battery claims as framed in the complaint. In the case cited by plaintiffs, *Filmways Pictures, Inc. v. Marks Polarized Corp.*, 552 F. Supp. 863, 868 (S.D.N.Y. 1982), the district court denied a motion to dismiss a counterclaim for damages based on an assault to the corporation's employee. However, the Northern District of Illinois rejected that analysis holding that a corporation cannot be a person for the purposes of the tort of assault. *See Ntron Int'l Sales Co. Inc . v. Carroll,* 714 F. Supp. 335, 339 (N.D. Ill. 1989).

Finally, with respect to Turnage's false arrest claim and Turnage and Eichelberger's false imprisonment claims, Turnage testified that he approached See to ask what was going on and she told him to "step back." He further testified that he asked Humitz, who was striking Jones with a fist, to take Jones out of the church. He later asked for badge numbers after he was ignored. Humitz let Turnage know with his eye contact that he should not ask the question, and then Humitz came out of the pulpit and attacked Turnage. Further, there is testimony that See instructed Humitz to arrest Turnage because he kept coming up to the pulpit while she was trying to take Jones into custody, but See testified that no one prevented her from cuffing Jones. Finally, there is testimony from both Turnage and Eichelberger that they were forcibly detained against their will. Ultimately,

Turnage was arrested for resisting/obstructing an officer, and the charges were dismissed without prejudice.

For these reasons, the court granted in part and denied in part defendants' motion for partial summary judgment. The following claims were dismissed during the March 28, 2013, hearing: (1) Family Worship's false imprisonment and false arrest claims; (2) plaintiffs Turnage and Eichelberger's trespass claims; (3) claims against the City of Milwaukee; (4) any duty to intervene claim argued by plaintiffs with respect to Humitz; and (5) the state law claims of assault and battery by Family Worship. All remaining First, Fourth, and Fourteenth Amendment and state law claims will proceed to trial.

Dated at Milwaukee, Wisconsin, this 12th day of April, 2013.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE